IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| T-REX PROPERTY AB, | § § | |
| v. | § § | Case No. 6:16-cv-927-JDK-KNM |
| REGAL ENTERTAINMENT GROUP. | § § § | (Lead Case) |

| | | |
|---|---|---|
| T-REX PROPERTY AB, | § § | |
| v. | § § § | Case No. 6:16-cv-974-JDK-KNM |
| CLEAR CHANNNEL OUTDOOR HOLDINGS, INC; CLEAR TV MEDIA USA, INC.; AND MONSTER VISION, LLC D/B/A/ MONSTER MEDIA. | § § § § § | (Consolidated Case) |

## ORDER

Before the Court is Defendant Clear Channel Outdoor Holdings, Inc.'s ("Clear Channel" or "Defendant") Motion to Exclude the Expert Testimony of T-Rex's Damages Expert Walter Bratic ("Motion to Exclude") (Doc. No. 129). Having considered the Parties' submissions, oral argument, and the relevant law, the Court **DENIES** Clear Channel's Motion to Exclude (Doc. No. 129).

## BACKGROUND

In June of 2016, Plaintiff T-Rex Property AB ("T-Rex" or "Plaintiff") filed the above-captioned suits alleging infringement of multiple claims of U.S. Patent Nos. RE39,470 ("the '470

Patent"); 7,382,334 ("the '334 Patent"); and 6,430,603 ("the '603 Patent") (collectively, the "Patents-In-Suit"). On April 18, 2017, the Court consolidated the cases.[1] Doc. No. 56.

T-Rex retained Walter Bratic to determine the amount of damages owed to Plaintiff as a result of Clear Channel's alleged infringement of the Patents-In-Suit. Doc. No. 129-2 at ¶ 2. Mr. Bratic opined that Clear Channel would have agreed to a running royalty rate of 1.85% in a hypothetical negotiation. *Id.* at ¶ 8. Mr. Bratic further estimated that from July 2, 2010 through April 28, 2019, Defendants sold and generated gross revenues from the accused services of approximately $1.0 billion. *Id.* at ¶ 9. Applying his running royalty rate of 1.85% resulted in "reasonable royalty damages of no less than approximately $18.5 million . . . ." *Id.*

Mr. Bratic principally relies on two license agreements to support his opinion. First, Mr. Bratic relies on an agreement between Novus Partners LLC ("Novus"), T-Rex's predecessor-in-interest to the '603 Patent, and Clear Channel (the "Novus/Clear Channel Agreement") that bears an effective date of November 1, 2005. *See id.* at ¶ 52; Doc. No. 144 at 39; Doc. No. 147 at 14; *see also* Doc. No. 130-11. According to Mr. Bratic, Novus and Clear Channel entered into this agreement "under which Clear Channel wished to obtain a license to the 'Licensed Patents' (as defined in the agreement) . . . ." Doc. No. 129-2 at ¶ 52; *see also* Doc. No. 130-11 at 2. The "Licensed Patents" included "three U.S. Patents, including the '603 Patent, and 13 U.S. Patent Applications." Doc. No. 129-2 at ¶52; *see also* Doc. No. 130-11 at 15-16. Mr. Bratic was advised, however, that the Novus/Clear Channel Agreement "terminated July 30, 2008, when Clear Channel underwent a change of control." Doc. No. 129-2 at ¶ 52. Thus, Mr. Bratic assumes "that from July 30, 2008 through the present time, Clear Channel has not been licensed under the '603 Patent." *Id.* Clear Channel, on the other hand, disputes whether the Novus/Clear Channel

---

[1] All docket references, unless otherwise indicated, refer to the *T-Rex Prop. AB v. Regal Entm't Grp.*, No. 6:16-cv-927-JDK-KNM (E.D. Tex.).

Agreement terminated and argues the Novus/Clear Channel Agreement was "reaffirmed in September 2009 when Novus and [Clear Channel] entered into a First Amendment to License Agreement." Doc. No. 130 at 24; Doc. No. 147 at 14-18.

Second, Mr. Bratic relies on an agreement between T-Rex and Clear Channel "under which, [according to Mr. Bratic,] Clear Channel wished to obtain a license to certain 'T-Rex Patents,' which included the '470 Patent and 'all other Patents that were owned or controlled by T-Rex in the United States' as of April 1, 2013" (the "T-Rex/Clear Channel Agreement"). Doc. No. 129-2 at ¶ 59. According to Mr. Bratic, as of April 1, 2013, "T-Rex 'owned or controlled'" the '470 Patent, the '334 Patent and U.S. Patent No. 6,507,949. *Id.* Mr. Bratic notes that "T-Rex did not receive rights to the '603 Patent until January 23, 2015." *Id.* at 25 n.138. Mr. Bratic asserts that the T-Rex/Clear Channel Agreement granted Clear Channel a "non-exclusive, non-transferable, fully paid-up, right, license, and privilege, past, present and future, under any and all claims of the 'T-Rex patents' . . . , to make, have made, use, sell, offer for sale or import Outdoor Connect throughout the Untied States." *Id.* at ¶ 61. Mr. Bratic notes that the T-Rex/Clear Channel Agreement "was not intended to cover Accused Services at issue in this matter as they relate to airports." *Id.*

Defendant filed the instant motion arguing that "[t]he Court should strike [Mr.] Bratic's testimony . . . because it depends from unreliable and unknown sources of information." Doc. No. 129 at 2. Accordingly, Clear Channel moves to prevent Mr. Bratic from rendering expert opinions at trial on the following: (1) Bratic cannot opine on a hypothetical running royalty rate when 37 of the 38 licenses obtained by T-Rex were for lump sum payments, and there is no support that Clear Channel would ever have agreed to a 1.85% running royalty license agreement"; and (2) "Bratic

3

cannot opine on a hypothetical royalty rate for a group of patents which includes the '603 Patent to which Clear Channel has an existing license." *Id.*

## LEGAL STANDARD

*Daubert Motion*

Under Federal Rule of Evidence 702, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The trial judge has a gate-keeping role to ensure that expert testimony is relevant and reliable. *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993). Indeed, "[t]he proponent [of the expert testimony] need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th. Cir. 1998). "The reliability prong [of *Daubert*] mandates that expert opinion 'be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief.'" *Johnson v. Arkema*, *Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (quoting *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999)).

Factors to consider in determining whether a proposed expert's methodology is scientifically valid or reliable are:

> (1) whether the expert's theory can be or has been tested;
> (2) whether the theory has been subject to peer review and publication;
> (3) the known or potential rate of error of the technique or theory when applied;
> (4) the existence and maintenance of standards and controls; and

4

> (5) the degree to which the technique or theory has been generally accepted in the scientific community.

*See Daubert,* 509 U.S. at 593–95. A court must decide whether the *Daubert* factors are appropriate, use them as a starting point, and then ascertain if other factors should be considered. *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007).

In *Kumho Tire Company, Limited v. Carmichael*, the Supreme Court applied the *Daubert* principles to technical or specialized expert testimony. 526 U.S. 137 (1999). The Court explained that the overarching goal of *Daubert*'s gate-keeping requirement is to "ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. A trial court has the discretion to exclude expert testimony if there is "simply too great an analytical gap" between the expert's reasoning and the conclusion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"At base, 'the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court.'" *Eidos Display, LLC v. Chi Mei Innolux Corp.*, No. 6:11-CV-201-JRG, 2017 WL 1079441, at *2 (E.D. Tex. Mar. 22, 2017) (quoting *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015)). "Under Rule 702, the question is whether the expert relied on facts sufficiently related to the disputed issue." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011). "To properly carry this burden, the patentee must 'sufficiently [tie the expert testimony on damages] to the facts of the case.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315–16 (Fed. Cir. 2011) (citation omitted). "Questions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury." *i4i Ltd. P'ship*, 598 F.3d at 856. "The jury [is] entitled to hear the expert testimony and decide for itself what to accept or reject." *Id.*

"*Daubert* and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness." *Id.* at 854. Also, the "existence of other facts . . . does not mean that the facts used failed to meet the minimum standards of relevance or reliability." *Id.* at 855–56. For example, "any reasonable royalty analysis necessarily involves an element of approximation and uncertainty." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) (citation and internal quotation omitted).

## **ANALYSIS**

Clear Channel seeks to exclude Mr. Bratic's opinions as unreliable for three reasons. First, Clear Channel argues that Mr. Bratic reviewed 39 license agreements between T-Rex and third-parties in connection with the Patents-In-Suit, but found 37 of those agreements not to be probative of the value of the Patents-In-Suit. Doc. No. 129 at 4-5 (quoting Doc. No. 129-2 at ¶ 69). Second, Clear Channel contends that Mr. Bratic failed to provide any reliable support for his opinion that Clear Channel would have agreed to a running royalty rate in a hypothetical negotiation where all 39 of the license agreements entered by T-Rex were for lump-sum payments. *Id.* at 5. Third, Clear Channel argues Mr. Bratic's opinion is unreliable because he failed to consider the extension of the Novus/Clear Channel Agreement, which covered the use of the technology in the '603 Patent. *Id.* at 7. The Court addresses each argument in turn.

"Litigants routinely adopt several approaches for calculating a reasonable royalty." *Lucent Techs., Inc. v. Gateway, Inc.*, 5801 F.3d 1301, 1324 (Fed. Cir. 2009). One of the more common approaches, "called the hypothetical negotiation or the 'willing licensor-willing licensee' approach, attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Id.* (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)). "The hypothetical

negotiation tries, as best as possible, to recreate the *ex ante* licensing scenario and to describe the resulting agreement." *Id.* at 1325. Mr. Bratic's reasonable royalty analysis is guided by the factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970). *See* Doc. No. 129-2 at ¶ 47.

"The second *Georgia-Pacific* factor is '[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit.'" *Lucent Techs., Inc.*, 580 F.3d at 1325 (quoting *Georgia-Pacific Corp.*, 318 F. Supp. at 1120). "This factor examines whether the licenses relied on by the patentee in proving damages are sufficiently comparable to the hypothetical license at issue in suit." *Id.* (citation omitted). "Subsumed within [the second *Georgia-Pacific* factor] is the question of whether the licensor and licensee would have agreed to a lump-sum payment or instead to a running royalty based on ongoing sales or usage." *Id.* at 1326. "Significant differences exist between a running royalty license and a lump-sum license." *Id.* Accordingly, "[f]or a jury to use a running-royalty agreement as a basis to award lump-sum damages, . . . some basis for comparison must exist in the evidence presented to the jury." *Id.* at 1330. The converse of this rule, as explained by the Federal Circuit in *Whitserve, LLC v. Computer Packages, Inc.*, is that "lump sum payments similarly should not support running royalty rates without testimony explaining how they apply to the facts of the case." 694 F.3d 10, 30 (Fed. Cir. 2012).

> I. **Mr. Bratic's Decision Not to Rely on Certain License Agreements Between T-Rex and Third Parties to Support His Damages Analysis**

Clear Channel first argues that Mr. Bratic's opinion is unreliable because he summarily dismissed 37 of the 39 license agreements between T-Rex and third-parties. Bratic "'did not find these agreements to be probative of the value of the [Patents-In-Suit] because they generally provided lump-sum royalty payments, and there was no information regarding the licensees' extent of use of the [Patents-In-Suit].'" Doc. No.129 at 4 (quoting Doc. No. 129-2 at ¶ 69) (first alteration

7

in brief). Clear Channel contends that Mr. Bratic's explanation for finding the agreements not probative is "nonsensical." *Id.* at 5. Clear Channel points out that "T-Rex's corporate representative . . . testified that **all** of T-Rex's license agreements regarding the [Patents-In-Suit] have resulted in lump-sum agreements." *Id.* (emphasis in brief) (citing Hylin Dep. (Doc. No. 129-2) at 136:3-6). Clear Channel also asserts that Mr. Bratic "provides no explanation why he failed to obtain any information regarding the licensee's use of the allegedly infringing systems." *Id.* Clear Channel notes that Mr. Bratic relied on public information sources to support his damages opinion against Clear Channel, but did not attempt to do a similar analysis for any of the other 37 licensing agreements with third parties, some of which were publicly traded companies. *Id.*

In response, T-Rex argues that Mr. Hylin, its corporate representative, testified that the other lump-sum licenses were entered into in early settlements of litigation prior to discovery. Doc. No. 137 at 5. "Thus, unlike [Clear Channel's] prior license with T-Rex, these licenses were not done in a situation where the parties both had insights into even one side's representation as to the revenues implicated." *Id.* As a result, "it was not possible for Mr. Bratic to calculate an effective royalty rate for these licenses that would satisfy the reasoning in *Whitserve* and inform his opinion." *Id.* T-Rex argues that Mr. Bratic's decision not to consider every license agreement between T-Rex and third parties "may pertain to the weight of Mr. Bratic's testimony, . . . but it does not affect its admissibility." *Id.*

Mr. Bratic's decision not to rely on some license agreements between T-Rex and certain third-parties does not make his opinion unreliable. Mr. Bratic examined the 37 license agreements and determined, for a number of reasons, that they were not probative of the value of the Patents-In-Suit. Doc. No. 129-2 at ¶ 69. A spreadsheet, attached to Mr. Bratic's expert report as Exhibit 8, lists the license agreements between T-Rex and third parties that Mr. Bratic considered. *See id.* at

8

100-106. The spreadsheet contains Mr. Bratic's notes where he indicates why the referenced license agreement may not be useful in his damages analysis. *See id.* For example, Exhibit 8 lists a license agreement between T-Rex and Time-O-Matic, LLC for the '470 Patent, the '334 Patent, and "[a]ll other patents that are now owned or controlled by T-Rex . . . ." Doc. No. 129-2 at 100. Mr. Bratic's notes indicate that the consideration paid, a lump-sum of $450,000, "represented a purported very substantial early settlement discount by T-Rex because this Agreement was reached prior to the commencement of discovery." *Id.* Mr. Bratic further noted that "[t]his license specifically excluded the operation of digital signage in an underground railway transportation environment." *Id.* Simply put, Mr. Bratic considered the 37 license agreements between T-Rex and various third-parties, but found them not to be probative of the value of the Patents-In-Suit. *See id.* at ¶ 69; *id.* at 100-106. Ultimately, Mr. Bratic's decision not to rely on certain license agreements in his damages analysis goes to the weight of the evidence, but does not render Mr. Bratic's opinion unreliable.

## II. Mr. Bratic's Opinion That Clear Channel Would Have Agreed to a Running Royalty Rate of 1.85%

Clear Channel next contends that Mr. Bratic failed to provide any reliable support for his opinion that Clear Channel would have agreed to a running royalty rate in a hypothetical negotiation where all 39 of the license agreements entered by T-Rex were for lump-sum payments. Doc. No. 129 at 5. Clear Channel contends that the only license agreement identified by Mr. Bratic that contains a running royalty provision is the Novus/Clear Channel Agreement. Doc. No. 129 at 5-6; *see* Doc. No. 129-5. Clear Channel emphasizes that the running royalty rate in the Novus/Clear Channel Agreement was "only applicable to 'Non-Controlled Affiliates' of Clear Channel, and not Clear Channel itself . . . ." Doc. No. 129 at 6.

T-Rex responds that the Novus/Clear Channel Agreement "is . . . extremely relevant to the analysis of damages in this case. This license is, in fact, a license that [Clear Channel] itself took to patents covering technology in precisely the same subject matter area at issue here." Doc. No. 137 at 5. Therefore, T-Rex concludes, the Novus/Clear Channel Agreement is "highly relevant evidence of the value [Clear Channel] places on the use of the patented technology." *Id.* at 5-6. T-Rex also contends that "Mr. Bratic properly looked to the actual running royalty rates agreed upon in the [Novus/Clear Channel Agreement]." *Id.* at 6. In that agreement, T-Rex notes, Clear Channel "agreed to pay a running royalty of 3% on behalf of non-controlled affiliates who required a license." *Id.*

Mr. Bratic's reliance on the running royalty provision in the Novus/Clear Channel Agreement to show Clear Channel's willingness to agree to a running royalty rate in a hypothetical negotiation does not make Mr. Bratic's opinion unreliable. In the Novus/Clear Channel Agreement[2], Novus granted Clear Channel a "'non-exclusive, non-sublicensable, non-transferable, royalty-free license to make, use, sell and offer for sale the technology claimed in the Licensed Patents' within the United States, Canada, and Mexico." Doc. No. 129-2 at ¶ 52. The Novus/Clear Channel Agreement contained four payment provisions, one of which provided "[f]or 'Non-Controlled Affiliates,' a royalty of three percent (3%) of Gross Sales Revenues during the term of the Novus/Clear Channel Agreement." *Id.* at ¶ 54 (citing CCO17909 – 929, at 911). Mr. Bratic explained that because Clear Channel had an economic interest in Novus, the Novus/Clear Channel Agreement represented an arm's-length transaction. *Id.* at ¶ 58. Put simply, Clear Channel's agreement to pay a running royalty rate for "Non-Controlled Affiliates" in the

---

[2] As discussed previously, Mr. Bratic contends that the Novus/Clear Channel Agreement covered three U.S. Patents, including the '603 Patent, and 13 U.S. Patent Applications. *See* Doc. No. 129-2 at ¶ 52.

Novus/Clear Channel Agreement shows, to some extent, its willingness to agree to a running royalty rate for technologically similar patents.

Clear Channel further argues that Mr. Bratic ignores "the almost completely uniform history of lump-sum license agreements regarding the Patents-in-Suit," but still opines that Clear Channel and T-Rex would have agreed to a running royalty rate of 1.85% in a hypothetical negotiation. Doc. No. 129 at 6. According to Clear Channel, Mr. Bratic's only support for this conclusion is "his mathematical conversion of a lump sum agreement[,]" the T-Rex/Clear Channel Agreement that addressed different accused systems, "into a running royalty rate, after the fact." *Id.* This type of analysis, Clear Channel argues, "is exactly the type of opinion that the Federal Circuit rejected in *Lucent* and *Whitserve.*" *Id.* (citing *Lucent*, 580 F.3d at 1326; *Whitserve*, 694 F.3d at 30). Finally, Clear Channel contends that Mr. Bratic has made the same errors in two other cases where he "had his opinions overturned . . . ." *Id.* at 7 (citing *XpertUniverse, Inc. v. Cisco Sys., Inc.*, No. 09-157, 2013 WL 936449, at *3 (D. Del. Mar. 11, 2013); *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 727 (E.D. Tex. 2011)).

In response, T-Rex argues that Clear Channel's blanket position that it is improper to use a lump sum license to calculate a reasonable royalty rate is incorrect. Doc. No. 137 at 3. T-Rex points to the language of 35 U.S.C. § 284 and notes that because there are no lost profits at issue in this matter, the statute led Mr. Bratic to calculate a reasonable royalty. *Id.* Mr. Bratic then calculated a reasonable royalty by "determining the effective royalty associated with the most relevant license at issue—the license [Clear Channel] itself took to the T-Rex patents (which [Bratic contends] did not include the '603 patent at that time)." *Id.* The fact that the consideration for the T-Rex/Clear Channel Agreement was in the form of a lump sum, T-Rex contends, "bears

on Mr. Bratic's opinion, if at all, in terms of the weight it should be given, not in terms of its admissibility." *Id.*

T-Rex further responds that Mr. Bratic analyzed the T-Rex/Clear Channel Agreement and provided "'testimony explaining how [it] appl[ies] to the facts of the case.'" *Id.* at 3 (quoting *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012)). T-Rex explains that "[t]he lump sum license Mr. Bratic considered as a part of his reasonable royalty analysis was the license that [Clear Channel] itself negotiated with T-Rex to patents that included two of the patents-in-suit here." *Id.* at 3-4 (emphasis in brief). "[D]uring the negotiation of that license, [Clear Channel] disclosed to T-Rex the amount of revenue that [Clear Channel] claimed was reasonably attributable to its use of the patents." *Id.* at 4 (citing Doc. No. 129-2 at ¶¶ 63-66). Using that figure, Mr. Bratic "was able to calculate the percentage that the payment [Clear Channel] made for the license represented the revenues claimed." *Id.* (citing Doc. No. 129-2 at ¶ 68). According to T-Rex, Mr. Bratic then used "the rate of sales prior to the license to project the amount of [Clear Channel's] sales from the date of that license to the present and then to extrapolate those sales to the imminent expiration of the last of the patents-in-suit." *Id.* Finally, Mr. Bratic applied the effective royalty rate calculated from the T-Rex/Clear Channel Agreement to Clear Channel's allegedly infringing sales in order to account for Clear Channel's extent of use of the Patents-In-Suit. *Id.*

In reply, Clear Channel clarifies that it does not take the "blanket position that it is improper to use lump sum licenses to arrive at a reasonable royalty rate[,]" but rather "contends that any such analysis must include an explanation as to how those licenses apply to the facts of the case." Doc. No. 141 at 2. Clear Channel contends that Mr. Bratic's opinion falls short in that regard. *Id.*

Clear Channel's reliance on *Lucent Techs., Inc. v. Gateway, Inc.* and *Whitserve, LLC v. Computer Packages, Inc.* is misplaced. In *Lucent*, the jury returned a verdict for the plaintiff in the form of a lump-sum royalty payment of $357,693,056.18. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). Microsoft Corporation challenged the jury award. *Id.* at 1324. On appeal, Lucent cited four running-royalty license agreements that it argued provided substantial evidence supporting the lump-sum damages award. *Id.* at 1329. The Federal Circuit noted that "a significant shortcoming of these agreements is their 'running-royalty' nature . . . ." *Id.* at 1329-30. The court referenced its earlier discussion of the "fundamental differences" between lump-sum agreements and running-royalty agreements, and explained that "[f]or a jury to use a running-royalty agreement as a basis to award lump-sum damages, . . . some basis for comparison must exist in the evidence presented to the jury." 580 F.3d at 1330. Ultimately, the Federal Circuit determined that the running royalty agreements did not constitute substantial evidence in support of the damages award because "the jury had almost no testimony with which to recalculate in a meaningful way the value of any of the running royalty agreements to arrive at the lump sum damages award." *Id.* at 1330.

Similarly, in *Whitserve, LLC v. Computer Packages, Inc.*, the defendant appealed the district court's denial of its post-trial motions on the ground that the jury's $8,378,145 damages award was not supported by substantial evidence and was against the clear weight of the evidence. 694 F.3d 10, 26 (Fed. Cir. 2012). The Federal Circuit determined that Dr. Shapiro, the plaintiff's damages expert, made several errors in his royalty rate calculation that caused "his ultimate opinion regarding a reasonable royalty rate to be speculative." *Id.* at 29. Dr. Shapiro determined that the royalty rate that would have resulted from a hypothetical negotiation between the parties was 16-19% of revenue. *Id.* The Federal Circuit explained that "[a] 19% of revenue rate, if upheld,

13

would support the jury's verdict because 19% of $42-43 million is roughly 8 million." *Id.* The plaintiff attempted to justify the 19% royalty rate by, in part, pointing to two lump sum royalties negotiated with the defendant's competitors. *Id.* at 29, 30. The Federal Circuit noted that the "converse of [the *Lucent*] rule applies here because lump sum payments similarly should not support running royalty rates without testimony explaining how they apply to the facts of the case." 694 F.3d 10, 30 (Fed. Cir. 2012). Applying that rule, the court determined that the lump-sum agreements were not substantial evidence in support of the jury's verdict because: (1) Dr. Shapiro did not offer any testimony explaining how the lump-sum payments could be converted to a royalty rate; and (2) despite correctly stating that the lump-sum payments support a "higher" rate under the *Georgia-Pacific* factors, "he offered no explanation of how much the rate should have been increased." *Id.* at 30.

Here, in contrast, Mr. Bratic explained how the T-Rex/Clear Channel Agreement applies to the facts of the case. *See* Doc. No. 129-2 at ¶¶ 59-68. According to Mr. Bratic's report, "T-Rex and Clear Channel entered into an agreement under which Clear Channel wished to obtain a license to certain 'T-Rex Patents,' which included the '470 Patent and 'all other Patents that were owned or controlled by T-Rex in the United States' as of April 1, 2013 . . . ." *Id.* at ¶ 59. As of April 1, 2013, the effective date of the license agreement, T-Rex "owned or controlled" the '470 Patent, the '334 Patent, and U.S. Patent No. 6,507,949. *Id.* Under the terms of the T-Rex/Clear Channel Agreement, "the parties agreed that in 'consideration of the license, release and covenants not to sue,' Clear Channel would pay to T-Rex a one-time, non-refundable payment of $550,000 . . . ." *Id.* at ¶ 62. Mr. Bratic then "calculated an effective royalty rate under the T-Rex/Clear Channel Agreement under the assumption that Clear Channel generated $15.0 million[3] in gross revenues

---

[3] This figure was disclosed in an email chain from Donna Schneider, "Clear Channel's Senior Corporate Counsel – Litigation," to Mr. Jack Olivo, a patent attorney at Olivo Patent Group, and Ms. Jackie Burt, a partner at Heninger

for the entire period from 2007 through the date of the agreement. . . ." *Id.* at ¶ 66. Mr. Bratic "considered [Clear Channel's] average monthly Outdoor Connect sales during the time period from January 2007 to April 2013, and projected this rate of licensed sales through the expiration of the [U.S. Patent No. 6,507,949], which [was] May 5, 2019." *Id.* at ¶ 68. "As a result of projecting Clear Channel's expected gross revenues, [Mr. Bratic] . . . determined the effective royalty rate under the T-Rex/Clear Channel Agreement was approximately 1.85%." *Id.* Thus, in contrast to *Lucent* and *Whitserve*, Mr. Bratic has provided a sufficient explanation as to "how [the lump-sum license agreement] appl[ies] to the facts of the case." *See Whitserve*, 694 F.3d at 30; *cf. Lucent*, 580 F.3d at 1330.

Defendant's reliance on *XpertUniverse, Inc. v. Cisco Sys., Inc.*, No. 09-157, 2013 WL 936449, at *3 (D. Del. Mar. 11, 2013) and *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 727 (E.D. Tex. 2011) is also unavailing. In *XpertUniverse, Inc.*, Mr. Bratic opined that based on a hypothetical negotiation between the parties, the defendant "would have paid [the plaintiff] a lump sum of $32.5 million in exchange for a license to the two patents in suit." *XpertUniverse, Inc.*, 2013 WL 936449, at *3. The defendant objected, arguing Mr. Bratic's opinion was a "faulty basis for recommending a lump sum." *Id.* Mr. Bratic used two license agreements he considered comparable—both of which employed a running royalty—and found they established a royalty range of 3-5%. *Id.* The court recognized that "[f]or a jury to use a running-royalty agreement as a basis to award lump-sum damages, . . . some basis for comparison must exist in the evidence presented to the jury." *Id.* (quoting *Lucent Techs., Inc.*, 580 F.3d at 1330). The court then explained that applying Mr. Bratic's 3-5% royalty rate to the sales of the accused products totaled damages

---

Garrison Davis, LLC. *Id.* at ¶ 64. In that email chain, "Mr. Olivo stated that 'from our discussions, there is a total of [$15.0 million] worth of Clear Channel commerce that we are addressing in terms of a settlement on the pending case.'" *Id.* (citing "VB Rule 408 Communication 2012-12-11.pdf") (alteration in original).

15

ranging between $38,962 and $64,938. *Id.* The court recognized that Mr. Bratic provided no basis for comparison between these amounts and his $32 million amount. *Id.* The court also recognized that Mr. Bratic did not "provide any explanation as to how the two running royalty agreements are probative of his $32 million lump sum payment." *Id.* Accordingly, the court granted defendants' motion to exclude Mr. Bratic's opinion that a hypothetical negotiation would have resulted in a lump sum of $32.5 million. *Id.* at *5.

Similarly, in *Mirror Worlds, LLC v. Apple, Inc.*, the court determined that the record lacked substantial evidence to support the jury's damages award and granted the defendant's request for Judgment as a Matter of Law to vacate the jury's damages award. 784 F. Supp. 2d 703, 727 (E.D. Tex. 2011). There, the court determined that Mr. Bratic and the plaintiff "presented a fatally flawed reasonable royalty analysis." *Id.* at 726. The court first explained that the plaintiff failed to "present a legally sound justification for its royalty base" where it improperly relied on the entire market value of the accused product and failed to properly apportion the royalty base to address the accused features. *Id.* Second, the court recognized that the plaintiff "failed to present a legally sound justification for its royalty rate." *Id.* at 727. The court recognized that the plaintiff failed to present evidence that would support its 8.8% running royalty rate on software and its 0.81% running royalty rate on hardware. *Id.* The court noted that "Mr. Bratic did not explain why Apple, in the hypothetical negotiation, would agree to a running royalty" and failed to account for several of the defendant's license agreements that did not award similar royalties. *Id.*

As explained above, Mr. Bratic provided an explanation as to how the lump sum in the T-Rex/Clear Channel Agreement is probative of his running royalty rate of 1.85%. Further, Mr. Bratic considered the 37 license agreements with third parties, but determined that, for various reasons, they were not probative of the value of the Patents-In-Suit. Mr. Bratic has sufficiently

explained how the lump-sum license agreement is probative of a running royalty rate in this case. Thus, *XpertUniverse, Inc.* and *Mirror Worlds, LLC* are inapplicable.

### III. Mr. Bratic's Failure to Consider the Alleged Extension to the Novus/Clear Channel Agreement That Covered the '603 Patent

Finally, Clear Channel argues Mr. Bratic's opinion is unreliable because he failed to consider the extension of the Novus/Clear Channel Agreement—the First Amendment to License Agreement (Doc. No. 129-6)—that allegedly covers the '603 Patent. Doc. No. 129 at 7. As a result of Mr. Bratic's failure to consider the First Amendment to License Agreement, Mr. Bratic "significantly expand[ed] the scope of damages . . . ." *Id.* at 8. Clear Channel, therefore, concludes that Mr. Bratic's failure to consider the First Amendment to License Agreement "demonstrates his opinion regarding the scope of potential [damages] is not tethered to the facts of this case." *Id.* at 9.

T-Rex responds that Clear Channel does not have a license to use the '603 Patent, and it "instructed Mr. Bratic, who is not a lawyer and was not tasked to undertake any analysis of this issue, to assume that position is correct." Doc. No. 137 at 6. Moreover, T-Rex concedes that "[i]f the Court were to conclude that [Clear Channel] is correct that it is licensed [to the '603 Patent], Mr. Bratic will be required to adjust his analysis to address that fact . . . ." *Id.* But, T-Rex contends, "it is not improper under these facts for Mr. Bratic to assume that [Clear Channel] is not licensed." *Id.*

The Parties dispute whether Clear Channel underwent a change of control that terminated the Novus/Clear Channel Agreement and whether the First Amendment to License Agreement "reaffirmed" or "extend[ed]" the Novus/Clear Channel Agreement. *See* Doc. No. 130 at 24; Doc. No. 144 at 39-42. T-Rex takes the position that Clear Channel underwent a change of control, and the Novus/Clear Channel Agreement terminated when Clear Channel failed to provide notice of

17

that change of control within the time required by the agreement. *See* Doc. No. 144 at 39. Further, T-Rex contends that the First Amendment to License Agreement did not "reaffirm" or "otherwise extend the terminated license." Doc. No. 144 at 40. In light of this position, Mr. Bratic, who is not an attorney, was "advised that the Novus/Clear Channel license terminated July 30, 2008[,]" the alleged date of the change in control of Clear Channel. Doc. No. 129-2 at ¶ 52. Mr. Bratic, therefore, assumes that "from July 30, 2008 through the present time, Clear Channel has not been licensed under the '603 Patent." *Id.* This assumption does not make Mr. Bratic's opinion unreliable where the parties vigorously dispute whether there was a change of control that terminated the Novus/Clear Channel Agreement and whether the First Amendment to License Agreement "reaffirmed" or "extend[ed]" the Novus/Clear Channel Agreement. Moreover, T-Rex concedes that if it is determined that Clear Channel has a license to the '603 Patent, then Mr. Bratic will be required to adjust his analysis (if permitted by the Court). Under these facts, Mr. Bratic's failure to consider the First Amendment to License Agreement does not render his opinion unreliable.

## CONCLUSION

For the foregoing reasons, Clear Channel's Motion to Exclude (Doc. No. 129) is **DENIED.**

So ORDERED and SIGNED this 16th day of July, 2019.

_____
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE